## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

Elaine D. Sanders,                                    Civil No. 11-1356 (JNE/JJG)

           **Plaintiff,**

v.                                                    **REPORT AND RECOMMENDATION**

Michael J. Astrue, Commissioner of
Social Security,

           **Defendant.**

_____

JEANNE J. GRAHAM, United States Magistrate Judge

      Plaintiff Elaine Sanders seeks judicial review of the denial of her application for Social Security supplemental security income (SSI) benefits. The case was referred to this Court for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and is presently before the Court on cross-motions for summary judgment. For the reasons set forth below, the Court recommends that Sanders' motion be granted as to remand, the Commissioner's motion be denied, and the case be remanded to the Social Security Administration pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Report and Recommendation.

## I.      BACKGROUND

      Sanders protectively filed an application for SSI benefits on July 27, 2007, alleging disability since October 1, 1992. (R. at 9, 11.) She was twenty-eight years old when she filed the application. (R. at 16.) Her alleged disabilities included degenerative joint disease, epilepsy, depression, asthma, post-traumatic stress disorder (PTSD), and intermittent explosive disorder. (R. at 131.) The application was denied at all stages of review, culminating in a final, adverse decision of the Commissioner on April 22, 2011. (R. at 1.)

### A.    Medical Evidence

On July 19, 2006, Sanders was taken to Regions Hospital from a Ramsey County workhouse and placed on a seventy-two hour psychiatric hold. (R. at 182.) Sanders had been acting aggressively toward staff and refusing to take her psychiatric medication. (*Id.*) At the hospital, Sanders admitted to general anxiety but denied any acute symptoms. (*Id.*) Dr. John Kelroy found no behavioral problems, no hallucinatory behavior, and only borderline anxiety and depression. (*Id.*) Dr. Kelroy's diagnoses included depressive disorder, intermittent explosive disorder, anxiety disorder, borderline personality disorder, asthma, degenerative joint disease, and a questionable history of epilepsy, among others. (R. at 182-83.)

Dr. Thomas Gratzer treated Sanders during her admission to Regions and noted she was well-known to the psychiatric staff there. (R. at 189.) Sanders said she had sought treatment at five other hospitals and attempted suicide at least fifteen times. (*Id.* at 189, 204.) Dr. Gratzer noted diagnoses of major depression, PTSD, intermittent explosive disorder, bipolar affective disorder, and borderline personality disorder. (R. at 190.) He recommended participation in a treatment program after her discharge. (R. at 191.)

Sanders was admitted again to Regions Hospital on October 19, 2006 with a headache and lacerations to her left wrist. (R. at 179.) She was incarcerated at the time at the Ramsey County Detention Center. (*Id.*) She told the intake physician, Dr. Joseph Madigan, that she had cut her wrists because the jail staff would not take her to an emergency room for headache pain. (*Id.*) Dr. Madigan described Sanders as cooperative and with a normal affect, mood, judgment, insight, and memory. (R. at 180.) Finding she was not a risk to herself or others, Dr. Madigan released her to return to jail. (*Id.*) Social worker Rosanne Kassekert believed that Sanders had acted manipulatively to gain access to medication. (R. at 181-82.)

Sanders returned to jail, and at the end of 2006, was placed in segregation. (R. at 223.) On January 23, 2007, she was admitted to St. Francis Hospital after taking twenty naproxen tablets. (R. at 245.) She said she took the medicine to get attention from prison medical staff because her pain issues were managed inadequately. (*Id.*) She disclaimed any suicidal intent. (*Id.*) Sanders was discharged and returned to jail the next day. (R. at 250.)

One week later, Dr. Purisimo Lucas treated Sanders for lung, wrist, and head ailments. (R. at 223.) Dr. Lucas noted difficult psychological problems and attention-seeking behavior. (*Id.*) For example, Sanders had recently used her asthma inhaler 130 consecutive times rather than the recommended 2 times. (*Id.*) Dr. Lucas felt Sanders no longer needed the inhaler and discontinued it. (*Id.*) An examination of Sanders' head and wrists was unremarkable. (*Id.*) When Sanders asked Dr. Lucas about knee replacement surgery, Dr. Lucas said she was too young and prescribed a muscle relaxant and pain reliever. (R. at 224.)

Dr. Kristine Klemm attended to Sanders several times during her incarceration. On December 6, 2006, Sanders was evaluated after acting aggressively toward staff. (R. at 235.) Dr. Klemm described Sanders as pressured in speech, overtly angered, likely paranoid, and with racing thoughts. (*Id.*) Two weeks later, Sanders refused to take her medication and appeared manic and paranoid to Dr. Klemm. (R. at 234.) Although Sanders asked for seizure medication, Dr. Klemm noted there was no evidence of seizures or a seizure-related diagnosis and declined to dispense it. (*Id.*) On March 31, 2007, Dr. Klemm wrote that Sanders never took her prescribed medication as directed, describing her lack of compliance as sabotage and manipulation. (R. at 231.)

When Dr. Klemm saw Sanders on May 1, 2007, she noted a diagnosis of mood disorder, not otherwise specified, versus bipolar affective disorder with history of possible psychosis. (R.

at 228.) Other diagnoses included antisocial personality disorder, borderline personality disorder, and a stable asthma history. (*Id.*) Dr. Klemm also remarked that Sanders did "not present as truly clinically depressed." (*Id.*) She encouraged Sanders to resume taking her prescribed medication. (*Id.*) A few weeks later, on May 29, 2007, Sanders refused to leave her bed. (R. at 227.) Dr. Klemm noted that Sanders was not able to control her behavior outside of the segregation unit, but she saw no evidence of an acute mood disorder, psychosis, or other unusual behavior. (*Id.*)

After Sanders was released from jail, she was referred to the emergency department at the Hennepin County Medical Center (HCMC) for a medication evaluation. (R. at 272.) She was not taking any medication at that time and felt depressed. (*Id.*) The clinician's impression was that Sanders suffered from a mood disorder, borderline personality disorder, PTSD, oppositional disorder, intermittent explosive disorder, seizure disorder, thyroid problems, gastroesophageal reflux disease, ulcers, and hypertension. (R. at 273.) Sanders was prescribed Effexor and Seroquel and advised she could return for refills as long as she followed up at the HCMC mental health clinic. (*Id.*)

Sanders returned to HCMC on August 10, 2007 with complaints of cracked feet, a fever, and bumps on her tongue. (R. at 276.) She did not have any physical complaints relating to degenerative joint disease, seizures, or asthma. (*Id.*) A month later, Dr. Ellen Coffey wrote that Sanders had not been able to afford her medications but wanted to re-start them. (R. at 274.) Sanders told Dr. Coffey she had many psychiatric diagnoses including bipolar affective disorder, depression, PTSD, borderline personality disorder, oppositional disorder, and intermittent explosive disorder. (R. at 275.) Dr. Coffey's impression was that Sanders suffered from possible bipolar affective disorder, possible hypothyroidism, and other somatic concerns. (R. at 275-76.)

On October 8, 2007, Sanders was admitted to Nancy Page Crisis Stabilization Services for treatment of depression, bipolar affective disorder, and borderline personality disorder. (R. at 280.) She had been staying at a Salvation Army shelter, but left after a physical altercation with a staff member. (R. at 281.) Sanders was described as cooperative, fully oriented, and with normal speech and thought processes, but also restless, distracted, anxious, and stressed. (R. at 281-82.) She was considered a high risk for suicide and a moderate risk for violence. (R. at 284.) Over the next several days, Sanders' condition improved significantly, and she was discharged. (R. at 289-95.) Her diagnoses at discharge were major depression/bipolar affective disorder and borderline personality disorder. (R. at 296.)

Dr. Azam Ansari saw Sanders at the request of the Minnesota Department of Jobs and Training on October 29, 2007. (R. at 299.) In the historical portion of his report, Dr. Ansari recounted that Sanders had received SSI benefits for as long as she could remember until May 2006, when benefits were terminated due to her incarceration.[1] (*Id.*) According to Sanders, her benefits were scheduled to be reinstated, but then she violated her probation. (*Id.*) On examination, Sanders denied any chest discomfort and said her asthma was under control with the use of an inhaler. (*Id.*) She had no joint pain and reported two petit mal seizures in the last three months. (R. at 300.) Dr. Ansari described Sanders with high, normal intellectual functioning. (R. at 301.) Her reflexes, gait, flexion, and limb extensions were also normal. (*Id.*) Dr. Ansari's provisional diagnoses included obesity, chronic asthma, sleep apnea, seizure disorder, major depression, anemia, and mild degenerative joint disease of the right knee. (*Id.*)

---

[1]     A claimant's SSI benefits are suspended during periods of incarceration. 20 C.F.R. § 416.1325(a). After twelve continuous months of suspension, eligibility for benefits is terminated. 20 C.F.R. § 416.1335. Benefits may be reinstated only after the claimant files a new application. *See Brennan v. Astrue*, 501 F. Supp. 2d 1303, 1309 (D. Kan. 2007).

Dr. Stan Kruglikov conducted a psychiatric assessment of Sanders on November 8, 2007. (R. at 303.) Sanders interacted appropriately and straightforwardly. (*Id.*) Her chief complaints were mood instability, periods of depression, and intense irritability and anger. (*Id.*) Dr. Kruglikov noted that Sanders had been hospitalized many times for suicide attempts or suicidal behavior. (*Id.*) Although Sanders had never exhibited psychotic symptoms, Dr. Kruglikov felt her presentation was consistent with a bipolar condition and intermittent explosive disorder. (R. at 305.) He recommended treatment with a mood stabilizer, anti-psychotic medication, and cognitive behavioral therapy. (*Id.*)

On May 20, 2008, after reviewing Sanders' medical records, consultative physician Dr. Aaron Mark determined that Sanders' physical impairments were asthma and petit mal seizures. (R. at 334.) He recommended that she not work at heights or around dangerous machinery. (*Id.*)

Sanders told Dr. Nicholas Johnson on June 17, 2008 that she had ceased using her inhaler three months ago because of side effects. (R. at 527.) She also said her asthma had improved over the past several years. (*Id.*)

Dr. Alford Karayusuf examined Sanders on July 14, 2008. (R. at 337.) He reviewed Dr. Kruglikov's medical reports, including the diagnoses of bipolar affective disorder and intermittent explosive disorder, and Dr. Klemm's progress notes, reflecting diagnoses of mood disorder, antisocial personality disorder, borderline personality disorder, and bipolar affective disorder. (*Id.*) Sanders told Dr. Karayusuf her intermittent explosive disorder had stabilized considerably since she began taking Depakote and Trileptal. (*Id.*) She reported a history of more than fifty psychiatric hospitalizations and more than twenty-five suicide attempts. (*Id.*) She frequently felt depressed and had suicidal thoughts. (R. at 338.) Sanders was living at the Salvation Army at that time. (*Id.*) On examination, Sanders was engaging, polite, and

6

cooperative. (*Id.*) She was also oriented, with good recall and memory. (*Id.*) She told Dr. Karayusuf her medication was very effective in reducing her temper outbursts. (R. at 339.) Dr. Karayusuf diagnosed Sanders with major depression, intermittent explosive disorder, and a history of antisocial personality disorder. (*Id.*) Her prognosis was guarded. (*Id.*) Dr. Karayusuf concluded that Sanders was able to understand and follow instructions and maintain pace and persistence. (*Id.*) She would be restricted, however, to brief, superficial, and infrequent interactions with fellow workers and the public. (*Id.*) The greatest obstacle to employment was her irritability and temper outbursts. (*Id.*) In addition, if suicide attempts and psychiatric hospitalizations continued at the same rate, they would probably "seriously interfere with long-term, productive, stable employment." (*Id.*)

Ten days after Dr. Karayusuf's report, medical consultant Janis Konke reviewed Sanders' medical records and found her either not significantly limited or only moderately limited in all areas of mental functioning except interaction with the public, which Konke assessed as markedly limited. (R. at 343-44.) Konke opined that Sanders should have only brief, superficial, and infrequent contact with coworkers. (R. at 345.) Konke noted also that Sanders' symptoms improved with medication. (*Id.*) In an accompanying Psychiatric Review Technique Form, Konke assessed Sanders for an affective disorder, anxiety disorder, and personality disorder. (R. at 347.) Under Listing 12.04 for affective disorders, Konke found evidence of a depressive syndrome and a manic syndrome, though not to the extent required for a medically determinable impairment. (R. at 350.) Konke did find, however, evidence of a bipolar affective disorder that did not precisely satisfy the diagnostic criteria of Listing 12.04 but nonetheless rose to the level of a medically determinable impairment. (*Id.*) Under Listing 12.06 for anxiety-related disorders, Konke found evidence of recurrent and intrusive recollections of a traumatic experience, which

were a source of marked distress. (R. at 352.) This finding was sufficient to establish the presence of the impairment. (*Id.*) Konke also found Sanders impaired by a personality disorder and an intermittent explosive disorder. (R. at 354.)

Moving to the paragraph "B" criteria of the listings, Konke found Sanders only moderately limited in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace. (R. at 357.) Konke also found no episodes of decompensation of extended duration. (*Id.*) Konke concluded that Sanders' mental status was intact, and her irritability had improved with medication. (R. at 359.) Thus, Sanders did not meet or equal any listing. (*Id.*)

On February 12, 2009, Sanders sought medical care at HCMC for left knee pain, which was precipitated by an incident at the shelter where she was residing. (R. at 457.) Her left knee did not appear swollen, and tenderness to palpation was generalized and mild. (*Id.*) She was prescribed a pain reliever and referred to the orthopedics department. (R. at 458.)

Sanders presented with suicidal ideation, anxiety, depression, mood swings, and left leg pain to the emergency department at Regions Hospital on March 10, 2009. (R. at 365.) She had recently fallen twice. (R. at 372.) Several views of Sanders' knee showed a displaced patella, moderate degenerative changes, and a chronic lucent cortical defect. (R. at 368.) She denied joint pain or stiffness, however. (R. at 369.) Sanders said she had stopped taking her medication because she could not afford it. (R. at 365.) She described flashbacks and a recurrent dream of someone getting shot, and she was admitted on a 72-hour hold for assessment and treatment. (R. at 366, 372.) During her stay, Sanders described mood swings consisting of depression to average feelings to anger. (*Id.*) She reported only one seizure in the past two years. (R. at 374.)

Two days after Sanders was admitted to the hospital, Dr. George Dawson noted improvement in her condition, but felt she was still unable to care for herself. (R. at 377-78.) During a follow-up visit a few days later, Dr. Dawson recorded a diagnosis of bipolar disorder. (R. at 380.) He found Sanders' judgment and insight impaired, but her other mental functions normal. (*Id.*) On March 23, 2009, Sanders was described by hospital staff as boisterous, but not dangerous or threatening. (R. at 383.) Two days later, she refused to take her seizure medication and reported having a conflict with other patients. (R. at 387.) Dr. Dawson recommended discontinuing the seizure medication. (R. at 390.)

In early April 2009, an "incident of aggression" occurred between Sanders and a hospital worker, resulting in a criminal charge of assault against Sanders. (R. at 399.) Dr. Dawson noted Sanders' long history of defiant, aggressive, and defensive behavior. (R. at 402.) He did not recommend that she be discharged or placed on voluntary status, however, given her unpredictable and aggressive behavior. (*Id.*) But on April 9, 2009, Sanders was assessed for discharge. (R. at 403.) Dr. Dawson noted that Ramsey County did not intend to file a petition (presumably for commitment) because it wanted Sanders to be processed through the criminal justice system rather than the probate system. (R. at 406.) Sanders had few housing options after she was discharged, due to "her aggressive and personality disordered behavior," and her case manager offered no services. (*Id.*) Dr. Dawson recommended supportive psychotherapy as part of Sanders' plan after discharge. (R. at 398.)

On April 24, 2009, Sanders presented to HCMC with right tooth pain and left knee pain. (R. at 455.) She had first noticed the knee pain about a week before and described it as feeling like "bone on bone." (*Id.*) On examination, Sanders felt some left knee tenderness with range of movement, but no joint tenderness on palpation. (R. at 456.) Her range of motion was normal.

(*Id.*) Dr. Tyler Dunphy thought Sanders could have early degenerative joint disease or a ligament strain. (*Id.*) Imaging results showed small bilateral knee effusion and mild degenerative joint disease. (*Id.*)

Sanders returned to HCMC for medication refills on April 30, 2009, asking for Depakote, Wellbutrin, and hydrochlorothiazide. (R. at 450.) She told the practitioner she had not taken any of those medications for two years and had not had a seizure in a long time.

Sanders was voluntarily admitted to HCMC on September 18, 2009, after a nurse considered her a danger to herself and at risk for acting out. (R. at 433.) Sanders was diagnosed with bipolar disorder and suicidal ideation during her stay, although she did not manifest any signs of psychosis or mania. (R. at 413, 427.) She was treated and discharged back to a women's shelter after hospital staff suspected her of malingering. (R. at 414, 417.)

Sanders commenced treatment with Dr. Frederick Langendorf in November 2009. (R. at 408.) He noted good seizure control with Depakote, although Sanders was concerned with weight gain, liver damage, and birth defects as possible side effects. (R. at 408-09.) Thus, Dr. Langendorf changed her prescription to Keppra. (R. at. 409.) Sanders told Dr. Peter Wasserman her psychiatric issues were under control, but she still felt depressed. (R. at 410.)

### B.    Other Evidence of Record

A Social Security field office interviewer noted it was "unfortunate that SSI could not re-instate [Sanders'] benefits without having to go through the whole medical review process. She was ineligible due to a period of incarceration." (R. at 128.) In addition, Sanders told the interviewer she had not been able to resume her medication, and she was worried she could not control herself. (*Id.*) She admitted she might try to be admitted to a hospital again so that she would not be homeless. (*Id.*)

In an accompanying disability report, Sanders reported she was unable to work due to lack of skills, physical and emotional disabilities, lack of training, joint pain, swelling and pain in her knees, and asthma. (R. at 131.) She had to stop working her previous job with a circus when she became unable to lift. (*Id.*) She had also worked temporarily as a sandwich maker and Salvation Army bell ringer. (R. at 132.)

In September 2007, Sanders completed a self-evaluation in which she noted that depression stifled her creativity and reduced her energy. (R. at 143.) In addition, her asthma and degenerative joint disease affected her ability to lift, walk, and run. (*Id.*) She had no problems with personal care or preparing meals when allowed, and she could also wash windows, sweep, mop, wash dishes, iron, clean cabinets, make her bed, and perform most outdoor chores. (R. at 144.) She shopped for food and clothes, wrote poetry and stories, played games, and went to church almost daily. (R. at 145-46.) She could follow written instructions, but not oral ones. (R. at 147.) She handled stress well, but did not care for authority figures. (R. at 148.)

## C.   Administrative Proceedings

After Sanders' SSI application was denied initially and on reconsideration, she requested a hearing before an ALJ. At the January 6, 2010 hearing, Sanders testified that she sold books of her poetry on the street but never made more than $1000 a month. (R. at 26-27.) She lived in a homeless shelter and received temporary general assistance. (R. at 28-29.) She heated her meals in a microwave and rarely cleaned her room. (R. at 36.) She did not have a driver's license and was scared to drive because of her seizure disorder. (R. at 37.)

Sanders testified further that her mental impairments were major depression, bipolar affective disorder, intermittent explosive disorder, and PTSD. (R. at 29, 30.) Medication was somewhat effective in treating her symptoms, but she experienced side effects such as mild

sedation, shakiness, and possible liver damage. (R. at 35-36.) She had been hospitalized many times for suicide attempts and depression. (R. at 39.) Sanders conceded she had an attitude problem and could be abrasive to others. (R. at 38.) Her short-term memory was impaired, and her concentration was unreliable. (*Id.*) Sanders' physical impairments included degenerative joint disease, a thyroid condition, epilepsy, and asthma. (R. at 39.) Medication was largely effective in controlling her seizures until somewhat recently. (R. at 38.) Her most recent seizure was about two and a half months before the hearing. (*Id.*) After her medication was changed to Keppra, the seizures essentially ceased again. (*Id.*)

After Sanders testified, the ALJ asked vocational expert William Villa to consider a thirty-year-old person with a high school degree and no past relevant work experience, who would be limited to simple, routine work with occasional changes in the work setting, and who would be further limited to only occasional interaction with coworkers and supervisors. (R. at 42.) Villa testified that such a person could work as a medium, unskilled laundry worker or a medium, unskilled hand packager. (*Id.*) If absenteeism once a month were added to the hypothetical question, the person would not be employable. (R. at 43.)

The ALJ issued an unfavorable decision on April 5, 2010, finding that Sanders was not disabled as of the date the application was filed.[2] (R. at 6.) Following the sequential evaluation process for SSI disability determinations promulgated in 20 C.F.R. § 416.920(a)(4), the ALJ first determined that Sanders had not engaged in substantial gainful activity since the application date of July 27, 2007. (R. at 11.) Next, the ALJ found that Sanders had severe impairments of depression, anxiety, personality disorder, and substance abuse disorder. (*Id.*) He rejected the seizure disorder and asthma as severe impairments, based on Sanders' self-reports to doctors,

---

[2]  SSI benefits are not payable prior to or for the month in which the application is filed. *See* 20 C.F.R. § 416.335.

treatment notes, and her medical history. (R. at 11-12.) He did not consider whether degenerative joint disease was a severe impairment.

At step three, the ALJ determined that Sanders did not have an impairment or combination of impairments meeting or medically equaling an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 12.) He considered whether her mental impairments met or equaled the criteria of Listings 12.04, 12.06, 12.08, or 12.09, but because her mental impairments did not cause at least two marked limitations, or one marked limitation and repeated episodes of extended decompensation, the paragraph B criteria of those listings were not satisfied. (*Id.*)

Moving to step four, the ALJ assessed Sanders' residual functional capacity (RFC) as able "to perform a full range of work at all exertional levels but with the following nonexertional limitations: simple and routine tasks in unskilled work with no more than occasional changes in the routine work setting which does not require public contact or more than occasional contact with coworkers and supervisors." (R. at 13.) In arriving at this RFC, the ALJ reduced the claimed severity of Sanders' subjective complaints as inconsistent with the objective medical evidence, the conservative nature of her treatment, and her work history. (R. at 14, 16.) He also placed significant weight on the opinions of Konke and Dr. Karayusuf. (R. at 15, 16.)

Because Sanders had no past relevant work experience, the ALJ progressed to the fifth step of the sequential evaluation. (R. at 17.) He considered her RFC, age, education, and work experience in conjunction with the Medical-Vocational Guidelines of 20 C.F.R. Part 404, Subpart P, Appendix 2. (*Id.*) As Sanders' ability to work at all exertional levels was affected by her nonexertional limitations, the ALJ relied on Villa's testimony in determining the extent of erosion. (*Id.*) He adopted Villa's testimony that an individual with Sanders' characteristics would

be able to work as a laundry worker or a hand packager, both of which were present in significant numbers in the national economy. (*Id.*) Therefore, the ALJ determined that Sanders was not disabled. (*Id.*)

The Appeals Council denied review of the ALJ's decision, which therefore became the final decision of the Commissioner. (R. at 1.) Sanders then commenced this action for judicial review.

## II. STANDARD OF REVIEW

To receive SSI benefits, an individual must be found disabled as defined by the Social Security Act and accompanying regulations. *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010); 20 C.F.R. § 416.901. Disabled is defined "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a). It is the claimant's burden to prove disability. *Teague v. Astrue*, 638 F.3d 611, 615 (8th Cir. 2011).

On review of a decision denying Social Security benefits, a court examines whether the findings and conclusion of the ALJ are legally sound and "supported by substantial evidence in the record as a whole." *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008) (citation omitted). "Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the ALJ's decision." *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006). Although the Court must consider "[e]vidence that both supports and detracts from the ALJ's decision," the ALJ's decision may not be reversed merely because some evidence supports another outcome. *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005). If it is possible to

reach conflicting positions from the record, but one of those positions is that of the ALJ, the decision must be affirmed. *Id.*

## III.    DISCUSSION

Sanders raises four challenges to the ALJ's decision. She first contends the ALJ should have found her physical impairments were severe at step two of the sequential evaluation. Second, she argues the RFC was inaccurate because the ALJ failed to limit her to brief and superficial interactions with coworkers. Third, she asserts she was not capable of performing other work, given the limitation to brief, superficial, and infrequent interactions. Lastly, she submits the ALJ improperly assessed her credibility.

### A.    Physical Impairments

The ALJ determined that Sanders' asthma and seizures were not severe impairments, and he did not assess the severity of her degenerative joint disease. At step two of the sequential evaluation, an ALJ considers the medical severity of a claimant's impairments. 20 C.F.R. § 416.920(a)(4)(ii). The impairment must have lasted or be expected to last continuously for at least twelve months. 20 C.F.R. § 416.909. An impairment is severe if it "significantly limits [the] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c). "Basic work activities" include walking, lifting, standing, pushing, reaching, carrying, speaking, using judgment, dealing with changes in the work environment, responding appropriately to others, and understanding and following simple instructions. 20 C.F.R. § 416.921(b); *see also* SSR 85-28, 1985 WL 56856, at *3 (S.S.A. 1985). If the ALJ is unable to determine the effect of an impairment on the claimant's ability to do these activities, he or she should continue with the sequential evaluation process. SSR 85-28, 1985 WL 56856, at *4.

### 1.      Seizure Disorder

In considering Sanders' seizure disorder, the ALJ noted her reports of shaking spells in her arms, with no loss of consciousness, lasting ten to twenty seconds and occurring primarily when she did not take her seizure medication. (R. at 11, 12.) In addition, the ALJ observed that physical examinations of Sanders' pupils, eye movement, vision, face symmetry and sensation, tongue, palate, fine finger movements, strength, and reflexes were all consistently normal. (R. at 11.) No health care provider, hospital worker, or prison official has ever seen Sanders have a seizure, although Sanders told Dr. Ansari that she had experienced two seizures in the three months preceding his consultative examination in October 2007.

Substantial evidence supports the ALJ's finding that Sanders' seizures were well-controlled with medication. Sanders' own testimony was that medication effectively controlled her seizures until recently before the hearing. She reported having one seizure two and a half months before the hearing and no seizures between the time her medication was changed from Keppra in early November 2009 and the administrative hearing in January 2010. Dr. Langendorf, who prescribed the new medication, noted that Sanders had good seizure control while on Depakote, but experienced seizures when off her medication. He changed her medication from Depakote to Keppra, not for lack of effectiveness, but because Sanders was concerned it could cause birth defects, liver problems, and weight gain.

With respect to the arm shakiness Sanders described to Dr. Langendorf, it is not immediately apparent from his treatment note whether the shakiness occurred when she was compliant or noncompliant with medication. Dr. Langendorf describes the shakiness as occurring "in more recent times." (R. at 408.) This statement, however, followed a description of seizures occurring since Sanders was seven years old. Thus, "in more recent times" could refer to any

time during Sanders' adulthood, not just the period of time immediately preceding the appointment. In addition, a logical conclusion is that the shakiness occurred when Sanders was off her medication, such as during her incarceration, when Sanders claimed she experienced two or three seizures a day.[3] It is unlikely Dr. Langendorf would have commented, "[t]here is no question that Depakote provides good seizure control for this patient," if she was experiencing arm shakiness while taking Depakote. Reading Dr. Langendorf's comments in context, the Court finds substantial evidence to support the ALJ's finding that Sanders' seizure disorder was well-controlled by medication and that her arms shook only when she was not compliant.

Substantial evidence also calls into question whether Sanders had a seizure disorder at all. In December 2006, while Sanders was incarcerated, Dr. Klemm noted no evidence of seizures or a seizure-related disorder and refused to prescribe anti-seizure medication. In September 2007, after Sanders was reportedly off her medication for several months, she did not report any seizure activity to Dr. Coffey. Sanders told hospital staff in March 2009 that she had experienced only one seizure in the past two years. When she refused to take her seizure medication while hospitalized, Dr. Dawson simply discontinued the prescription, thereby exercising his medical judgment that she did not need it. There is no evidence that Sanders had a seizure after her medication was stopped. A month later, Sanders told a practitioner she had not taken seizure medicine for two years and had not had a seizure in a long time.

Although consultative physician Dr. Mark concluded from Sanders' medical records that she should not work at heights or around dangerous machinery due to her seizure disorder, neither working at heights nor being around dangerous machinery is a basic work activity.

---

[3] Although this self-report is directly contradicted by Dr. Klemm's treatment notes, the Court grants Sanders the benefit of the doubt for the purpose of the instant discussion.

Similarly, Sanders testified at the administrative hearing that she did not drive for fear she would have a seizure, but driving is not a basic work activity, either.

In sum, substantial evidence supports the ALJ's determination that Sanders' seizures were not a severe impairment. There is no period of time during which she had more than an occasional seizure for at least twelve months. In addition, her seizures did not significantly limit her ability to do basic work activities, and they were well-controlled when she took her medication.

### 2.    Asthma

With respect to Sanders' asthma, the ALJ relied on Dr. Ansari's treatment note that her asthma was under control with the use of an inhaler. (R. at 12.) The ALJ also noted that no significant medical intervention was ever required to treat her asthma. (*Id.*) Sanders faults the ALJ for failing to ask her at the hearing about the functional limitations her asthma caused, even when under control.

It is well established that an ALJ must fully and fairly develop the administrative record. *Driggins v. Harris*, 657 F.2d 187, 188 (8th Cir. 1981). The question for the Court is whether Sanders "was prejudiced or treated unfairly by how the ALJ did or did not develop the record." *Onstad v. Shalala*, 999 F.2d 1232, 1234 (8th Cir. 1993). The Court finds she was not prejudiced or treated unfairly by the ALJ's questions at the hearing, because the record concerning Sanders' asthma needed no further development.

There was ample, consistent evidence in the record from which to conclude that Sanders' asthma was not severe. In early 2007, Dr. Lucas discontinued the asthma inhaler because he felt Sanders no longer needed it. In August 2007, Sanders reported no physical complaints relating to asthma. Sanders told Dr. Ansari in October 2007 that her asthma was controlled with an inhaler.

Sanders told Dr. Johnson in June 2008 that she had ceased using her asthma inhaler three months before and that her asthma had improved over the past several years. There is scant mention of asthma-related complaints in the record after June 2008, and there is no mention of any functional limitation caused by Sanders' asthma.

In sum, the medical records uniformly indicate that Sanders' asthma was under control, and there was no evidence that her asthma caused any functional limitations or limited her ability to do basic work activities. Thus, substantial evidence supports the ALJ's determination that Sanders' asthma was not a severe impairment.

### 3.   Degenerative Joint Disease

Sanders argues that degenerative joint disease affected her ability to perform work functions such as standing, walking, and lifting. She contends the ALJ should have questioned her about these limitations at the hearing and at least discussed her degenerative joint disease in his assessment of her impairments.

Evidence in the record concerning Sanders' degenerative joint disease consists of the following. In 2006, while Sanders was admitted to Regions on a psychiatric hold, Dr. Kelroy noted a diagnosis of the condition. Also in 2006, while Sanders was incarcerated, Dr. Lucas told Sanders she was too young for knee replacement surgery and prescribed medication. Consultative examiner Dr. Ansari included degenerative joint disease as a provisional diagnosis in October 2007, but consultative reviewer Dr. Mark did not consider Sanders' degenerative joint disease to be a physical impairment in May 2008. When Sanders sought treatment for knee pain in February 2009, she said the pain was from an injury she incurred at the shelter, not degenerative joint disease. A month later, Sanders told a provider she had fallen recently, and imaging revealed a displaced patella and moderate degenerative changes. Despite these results,

treatment was conservative, and Sanders denied joint pain or stiffness. In April 2009, Sanders described knee pain and tenderness, and imaging results confirmed small effusions and mild degenerative joint disease. Dr. Dunphy opined that Sanders could be suffering from degenerative joint disease.

Title 20 C.F.R. § 416.908 informs claimants what evidence is needed to prove an impairment: "Your impairment must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms . . . ." In Sanders' case, although evidence of degenerative joint disease is sparse, there are clinical findings and diagnostic imaging that establish the existence of the impairment. Accordingly, the ALJ erred in not at least considering whether Sanders' degenerative joint disease was severe.

The Commissioner suggests that remand would be futile if Sanders will fail at some further step in the sequential evaluation. But courts should not speculate about the possible outcome, because the steps are for the ALJ "to consider in the first instance." *See Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 778 (6th Cir. 2008). Here, the ALJ did not consider whether Sanders' degenerative joint disease met or equaled a listed impairment or whether it affected her RFC, and it would not be appropriate for the Court to do so now.

**B.     Whether the RFC Was Supported by Substantial Evidence**

A claimant's RFC is what he or she can do despite his or her limitations. 20 C.F.R. § 416.945(a)(1). An ALJ must determine a claimant's RFC by considering "all relevant evidence, including medical records, observations of treating physicians and others, and [the]

claimant's own descriptions of his limitations." *Baldwin v. Barnhart*, 349 F.3d 549, 556 (8th Cir. 2003).

Here, the ALJ determined that Sanders could perform work that did not require contact with members of the public or more than occasional contact with coworkers and supervisors. Sanders notes that both Dr. Karayusuf and Konke, on whose opinions the ALJ purportedly placed great weight, limited her to superficial, brief, and infrequent interactions with coworkers. She argues that "occasional" is more expansive than "infrequent," and that the ALJ also should have included the descriptors "superficial" and "brief."

Social Security Ruling 83-10 defines "occasional" as "occurring from very little up to one-third of the time." 1983 WL 31251, at *5 (S.S.A. 1983). Although the ruling does not define the term "infrequent," it defines "frequent" as "occurring from one-third to two-thirds of the time." *Id.* at *6. Logically, since "infrequent" is less than "frequent," "infrequent" would be less than one-third of the time. This parallels the definition of "occasional." Thus, the ALJ's use of the term "occasional" was not inconsistent with Dr. Karayusuf's and Konke's opinions that Sanders would be limited to infrequent interactions with coworkers.

With respect to the terms "brief" and "superficial," Sanders argues they are not subsumed in the definition of "occasional." Sanders' point is well-taken. Even a job that requires only occasional interaction could require an employee to engage in prolonged or meaningful conversations during those few occasions. While it could very well be that the particular jobs of laundry worker and hand packager do not require more than brief and superficial contact with coworkers, the ALJ did not elicit that testimony from Mr. Villa.

Although the ALJ professed to place significant weight on the opinions of Dr. Karayusuf and Konke, he deviated from their opinions without explanation. The Commissioner attempts to

downplay Dr. Karayusuf's use of the terms "brief" and "superficial" by arguing these limitations were based on Sanders' tendency to lose her temper, which, as the doctor noted, had improved considerably. But it is clear from the context of Dr. Karayusuf's opinion that he believed Sanders would be limited to brief and superficial contact *even though* her temper had improved. Thus, the Commissioner's attempted distinction fails.

The Commissioner also identifies other evidence in the record to rebut the limitations, such as that Sanders had been described as friendly and cooperative, that she generally got along well with staff and residents at shelters, that her behavior improved with medication, and that she attended church and played cards. This evidence is not equivalent to an ability to tolerate more than brief and superficial interactions with coworkers, however.

The case should be remanded so that the ALJ can incorporate "brief" and "superficial" interactions with coworkers in the RFC or explain why he rejected these limitations offered by Dr. Karayusuf and Konke.

### C.    Whether Sanders Was Capable of Performing Other Work

Relatedly, Sanders argues that the ALJ's hypothetical question to the vocational expert should have included the limitations "brief" and "superficial," as well as "infrequent." As explained above, "infrequent" approximates "occasional," and the ALJ did not err by using the terms interchangeably. However, he should have also included "brief" and "superficial" contacts as limitations or given a reason for not doing so. The case should be remanded for him to do so.

### D.    The ALJ's Assessment of Sanders' Credibility

In assessing a claimant's credibility concerning subjective complaints, an ALJ must consider not only the objective medical evidence but also the claimant's prior work history, daily activities, extent and intensity of pain, side effects and effectiveness of medications, functional

restrictions, precipitating and aggravating factors, and observations by third parties. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ may discount the claimant's credibility when her subjective complaints are inconsistent with the record. *Id.* As long as the ALJ acknowledges and considers the factors, he need not discuss each one explicitly. *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009) (citations omitted).

In the case at hand, the ALJ found that Sanders' "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. at 13.) The ALJ reduced Sanders' credibility because of the conservative nature of her treatment, noncompliance with medication, inconsistencies with the objective medical evidence, and her lack of effort to find work within her limitations.

## 1.     Conservative Nature of Treatment

None of Sanders' providers ever recommended or instituted aggressive therapy or treatment consistent with debilitating symptoms. Conservative treatment of an impairment can be grounds to discredit a claimant's subjective complaints. *See Moore*, 572 F.3d at 525. Accordingly, the ALJ was entitled to weigh the conservative nature of Sanders' mental health treatment against her credibility.

Sanders asserts she was never ordered to participate in counseling or other mental health treatment but failed to do so. To the contrary, there are numerous references in the record to her failure to follow through with recommended treatment. For example, Dr. Gratzer advised Sanders to participate in a treatment program in July 2006 (R. at 191), a social worker encouraged Sanders to seek outpatient therapy after she was released from prison (R. at 267), Dr.

Kruglikov recommended cognitive behavioral therapy in November 2007 (R. at 305), and Dr. Dawson advised supportive psychotherapy in April 2009 (R. at 398). There is no evidence that Sanders followed through with any of these recommendations. An ALJ may discredit the subjective complaints of a claimant who does not follow through with suggested treatment. *Gray v. Apfel*, 192 F.3d 799, 804 (8th Cir. 1999) (citation omitted).

Sanders submits that any failure to obtain treatment was due to economic hardship. The Court acknowledges the predicament facing a person with no income or assets, and who suffers from a mental impairment, in obtaining mental health treatment. However, the record contains no indication that Sanders ever sought counseling or therapy and was denied such treatment because she could not afford it. Thus, her failure to obtain treatment is a proper component of the credibility analysis. *See Goff*, 421 F.3d 785, 793 (8th Cir. 2005); *see also Osborne v. Barnhart*, 316 F.3d 809, 812 (8th Cir. 2003) (concluding the ALJ correctly considered the plaintiff's failure to pursue mental health treatment, despite her assertion she did not have insurance, in finding she was not depressed). Nor is there any evidence that Sanders sought treatment at a community mental health service agency or assistance from a social worker or organization who could have helped her find treatment. Thus, Sanders' failure to obtain treatment was not due entirely to economic circumstances, and the ALJ appropriately considered it.

### 2. Objective Medical Evidence and Noncompliance with Medication

Sanders contends the ALJ wrongly discounted her complaints of mood instability and periods of depression, intense anger, and irritability as inconsistent with the medical evidence. Exhibiting a good mood and pleasant behavior on a few occasions, she argues, does not detract from her claim that her mood fluctuated uncontrollably.

The ALJ's findings are not incompatible with Sanders' claim. The medical records show that when Sanders took her medication as prescribed, her mood and depression improved, and her outbursts decreased in number and intensity. This is well-documented by Sanders' providers and her own self-reports. On the other hand, Sanders' mood fluctuated and her condition worsened when she did not take her medication. A claimant's lack of compliance with medication is a valid reason to discredit subjective complaints. *Wildman v. Astrue*, 596 F.3d 959, 969 (8th Cir. 2010).

### 3.      Lack of Effort to Find Work

Sanders objects to the ALJ's consideration of her lack of effort to find work, explaining it would be inconsistent for a person who is unable to work to look for a job. In reducing Sanders' credibility, the ALJ noted that Sanders' work history was erratic and generated nominal wages. He saw no indication that Sanders had ever attempted to find work within her limitations. Although it is permissible to infer from a sporadic work history that a claimant was not strongly motivated to engage in productive activity, *see Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011), the ALJ in this case failed to consider that Sanders had received SSI disability benefits for as long as she could remember, prior to her incarceration. Thus, her erratic work history and lack of effort to find work was more a result of her disabled status than lack of motivation. Consequently, the Court finds that the ALJ erred in not considering Sanders' prior disabled status as part of her work history, and the case should be remanded for this purpose.

## IV.   RECOMMENDATION

The Court has reviewed the record and finds that substantial evidence does not support the ALJ's determinations at steps two, four, and five of the sequential evaluation. The case should be remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for

further proceedings consistent with this Report and Recommendation. In particular, the ALJ should consider on remand (1) whether Sanders' degenerative joint disease was a severe impairment; (2) whether Sanders should be limited to superficial and brief, as well as infrequent, interactions with coworkers; and (3) what impact Sanders' prior disabled status had on her work history. The ALJ should then reassess Sanders' RFC and pose a revised hypothetical question to a vocational expert, if the ALJ revises the RFC.

Accordingly, **IT IS HEREBY RECOMMENDED** that:

1.      Plaintiff's Motion for Summary Judgment (Doc. No. 13) be **GRANTED** as to remand;

2.      Defendant's Motion for Summary Judgment (Doc. No. 18) be **DENIED**;

3.      This case be remanded to the Social Security Administration pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Report and Recommendation; and

4.      **JUDGMENT BE ENTERED**.

Dated: April 16, 2012

  _s/ Jeanne J. Graham_____
  JEANNE J. GRAHAM
  United States Magistrate Judge

**NOTICE**

Pursuant to District of Minnesota Local Rule 72.2(b), any party may object to this Report and Recommendation by filing and serving specific, written objections by **May 1, 2012**.  A party may respond to the objections within fourteen (14) days after service thereof.  Any objections or responses shall not exceed 3,500 words.  The district judge will make a de novo determination of those portions of the Report and Recommendation to which an objection is made.